Filed 2/28/25; modified and certified for publication 3/28/25 (both orders attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| GREAT OAKS WATER COMPANY,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>SANTA CLARA VALLEY WATER DISTRICT,<br><br>    Defendant and Respondent. | H050939<br>(Santa Clara County<br>Super. Ct. No. 2011-1-CV205462) |

This litigation began in 2005, when plaintiff Great Oaks Water Company (Great Oaks), a private water retailer that pumps and sells non-agricultural groundwater from its own wells, sued the Santa Clara Valley Water District (water district, or district), alleging that the district's groundwater pumping charges constituted unlawful property-related taxes levied without voter approval, in violation of the constitutional provisions implemented by Proposition 218. This court ultimately held in 2018 that those charges were not property-related taxes.

In the current iteration of the lawsuit, Great Oaks argues that the non-agricultural groundwater pumping charges for certain years constitute unlawful taxes levied without voter approval in violation of the constitutional provisions implemented by Proposition 26, enacted by voters in 2010. Great Oaks contends that the charges are more than necessary to cover the reasonable costs of the relevant governmental activity, and that the manner in which those costs are allocated to Great Oaks does not bear a fair or reasonable relationship to the benefits it receives from, or the burdens it imposes on, that

1

governmental activity, in violation of California Constitution article XIII C, section 1, subdivision (e).

According to Great Oaks, the water district uses revenue from the groundwater charges to subsidize its customers who receive water from alternative sources, such as imported or recycled water, to which Great Oaks has no access. In addition, Great Oaks argues that the water district's use of ad valorem property taxes to subsidize its heavily discounted agricultural groundwater pumping charges violates the California Constitution and relevant Water Code provisions.

The trial court rejected Great Oaks's arguments and entered judgment in the water district's favor. It held that: (1) the groundwater charges did not exceed the costs of the relevant governmental activity, which it defined as the water district's overall water management program; (2) it is reasonable to use those charges to pay for overall program costs because non-agricultural groundwater pumpers like Great Oaks receive significant benefits from the overall program; (3) the non-agricultural groundwater charges were reasonably allocated on a volumetric basis to the thousands of non-agricultural groundwater pumpers like Great Oaks; and (4) the discount for agricultural groundwater pumping is constitutionally valid because it is not funded with the money received from non-agricultural pumpers such as Great Oaks, but instead with an "open space credit" paid for with revenue from ad valorem property taxes imposed by Santa Clara County and transferred to the district.

Great Oaks challenges these holdings on appeal.

We conclude the groundwater charges levied against Great Oaks are not "taxes" because they fall under exceptions set out in Proposition 26. for a specific benefit conferred or privilege granted, or a specific government service or product provided directly to the payor that is not provided to those not charged. (Cal. Const., art. XIII C, § 1, subd. (e)(1), (2).) We also conclude the trial court properly determined the water district carried its burden under Proposition 26 to prove by a preponderance of the

2

evidence that the groundwater charges were not more than necessary to cover the reasonable costs of the relevant governmental activity, and that the manner in which those costs were allocated to Great Oaks bore a fair or reasonable relationship to the benefits it receives from, and the burdens it imposes on, that governmental activity. Finally, we conclude the water district's use of ad valorem taxes to fund the agricultural discount does not violate the California Constitution or Water Code.

We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND[1]

### A. *History and formation of the water district*

Groundwater pumping in Santa Clara County (County) began in the 1850s, when the first wells were drilled to supply water for residents, businesses, and agricultural uses. By the 1920s, the rate of pumping vastly exceeded the rate of natural replenishment, resulting in declining groundwater supplies, permanent land subsidence, and significant flooding. As a result, in 1929 the Legislature created the Santa Clara Valley Water Conservation District, a predecessor to the water district, to comprehensively manage water resources, stop groundwater overdraft and land subsidence, and protect the County from flooding.

In the 1930s, the water district constructed several conservation reservoirs to capture rainfall and begin replenishing the underground aquifer through managed groundwater recharge. However, over the course of the 1940s, the County's population grew from 30,000 to nearly 300,000. That growth, together with severe drought conditions, further depleted groundwater supplies, worsened subsidence, and caused saltwater intrusion into the aquifer. As a result, in 1951 the Legislature created the Santa Clara County Flood Control and Water Conservation District. (Stats. 1951, ch. 1405, § 2,

---

[1] We take our facts from the administrative record lodged with the trial court and included in the record on appeal.

p. 3337.)  In 1968, that agency merged with the agency created in 1929 to form the water district.

## B.  District's water supply system and conjunctive use policy

The annual amount of groundwater pumped in the County still far exceeds what is naturally replenished.  To counteract overdraft and its negative effects, the water district both replenishes the groundwater supply in various ways and provides water from other sources.  The overall water supply system is composed of storage, conveyance, recharge, treatment, and distribution facilities.

To avoid overdraft, the water district captures runoff in reservoirs and releases it into recharge ponds for percolation into the groundwater basin.   Water is also imported from the State Water Project and the Central Valley Project, some of which is delivered to streams and ponds for percolation.  Roughly half of the district's total water supply comes from local sources, while the other half is imported.  Some raw local and imported water is turned into drinking water at treatment plants, referred to as "in-lieu recharge."

The water district describes its overall water management strategy as one of "conjunctive use," or the coordinated use of groundwater and surface water resources.  According to the district, the "conjunctive management of surface water and groundwater maximizes water supply reliability, allowing [it] to store surface water in local groundwater basins to help balance pumping and provide reserves for use during dry years when surface water availability is limited."  It also helps protect against groundwater overdraft and land subsidence, prevent saltwater intrusion, and enhance natural recharge.  Under this approach, the district treats water as a fungible commodity, regardless of its source or cost, and "[t]he overall reliability of the water supply system is greatly enhanced when all of the components are combined to complete the water supply picture."

As discussed further below, the water district's taxing and pricing policy establishes groundwater charges that reflect the conjunctive management of surface

4

water, groundwater supplies, imported water, and recycled water, to prevent the overuse of the groundwater basin and promote effective use of alternative water resources.

### C. *Structure of the water district*

The water district is a special district governed by the Santa Clara Valley Water District Act (Chapter 60 of the Statutes of 1951), set forth in the Water Code Appendix (District Act, or Act).[2] The purpose of the District Act is to authorize the water district to provide comprehensive water management for all beneficial uses and flood risk reduction within the County. (§ 4, subd. (a).) The Act empowers the water district to undertake a range of actions, such as to "provide for the conservation and management of stormwater, recycled water, or other water from any sources within or outside the watersheds in which the district is located for beneficial and useful purposes, including spreading, storing, retaining, and causing the waters to percolate into the soil within the district." (§ 4, subd. (c)(3).)

It also authorizes the water district's board to establish various zones within the district boundaries, and to implement projects for the specific benefit of particular zones. (§ 3.) The water district is required to establish the zones prior to imposing any groundwater charge. (§ 26.2.) Accordingly, the water district has established two distinct zones of benefit based on the groundwater basins and water sources used within each zone—zone W-2, known as the "north zone," and zone W-5, known as the "south zone." Each zone has its own separate water system and different costs for providing services, but both zones use local and imported water to replenish the groundwater basins.

---

[2] Unspecified statutory references to the District Act are to this uncodified law as reprinted in West's Annotated Water Code Appendix. "Much of California's water law is comprised of 'uncodified acts,' also known and referred to as the 'Water Code Appendix.' " (Legislative Intent Service, Inc. California Water Code Statutory History, http://www.legintent.com/california-water-code-statutory-history, [as of February 25, 2025].)

The north zone covers 240 square miles overlaying the Santa Clara groundwater subbasin and includes most of the County's population, as well as its more densely populated residential and industrial areas. This zone requires imported water to bolster the water supply and includes three water treatment plants and distribution pipelines to receive, filter and distribute the imported water.

The south zone covers just 14 square miles of sparsely populated and primarily agricultural areas, overlaying two other groundwater subbasins and relying primarily on groundwater to serve roughly 50 percent agricultural and 50 percent non-agricultural water needs. No treated water is served to customers in the south zone, while only a small amount of treated and imported water is used to recharge the groundwater subbasins, which have the ability to absorb recharge and remain healthy at current water usage levels, unlike the north zone.

The zones group groundwater pumpers who are similarly situated with respect to the district's water supplies, and provide the basis for the water district's groundwater charges, which help pay for operations and capital projects associated with groundwater preservation and distribution of all water sources.

### D. Groundwater pumping charges

The water district's board has the power "to levy and collect a ground water charge for the production of water from the ground water supplies within a zone or zones of the district which will benefit from the recharge of underground water supplies or the distribution of imported water in such zone or zones." (§ 26.) The District Act declares that such groundwater charges are "in furtherance of district activities in the protection and augmentation of the water supplies for users within a zone or zones of the district that are necessary for the public health, welfare, and safety of the people of this state." (§ 26.3, subd. (a).) Groundwater charges are authorized to be levied on the production of groundwater from all water-producing facilities within the zones of the water district "for

6

the benefit of all who rely directly or indirectly on the groundwater supplies of the zone or zones and water imported into the zone or zones."  (§ 26.3, subd. (a).)

The District Act specifies that the proceeds of such groundwater charges must be used exclusively for the following purposes only:  (1) constructing, maintaining, and operating facilities to import water into the district to benefit the zone or zones; (2) purchasing water for importation into the zone or zones; (3) constructing, maintaining, and operating facilities to conserve or distribute water within the zone or zones, including for groundwater recharge, surface distribution, and purification and treatment; and (4) to pay bonded indebtedness or other obligations incurred by the water district for any of the purposes set forth in paragraphs (1), (2), and (3).  (§ 26.3, subd. (b).)

### E.  Taxing and pricing policy

The water district has adopted a resolution entitled "Water Utility Taxing and Pricing Policy" (pricing policy), which establishes pricing objectives and constraints for groundwater charges and other water usage rates.  The pricing policy states that "[t]he general approach is to charge the recipients of the various benefits for the benefits received from the [water district's] comprehensive water utility program."  It describes the "consumptive and nonconsumptive benefits" provided by the water district's overall operations as: (1) provision of a water supply and effective management of water resources available to the community from a variety of sources of supply, transmission, and water treatment facilities; (2) protection of water quality through the purification and treatment of water and the protection of water supplies; (3) stewardship of watersheds and riparian corridor; (4) administration of related programs and projects such as recycled water and water conservation; (5) flood protection; (6) recreation; (7) economic benefit for the community; and (8) protection of community infrastructure from subsidence.

The pricing policy enumerates four taxing and pricing concepts that guide the water district's approach to rate setting.  First, water is considered to be a single commodity regardless of its source or cost, so that all users are deemed to benefit from

7

the availability of multiple sources. Second, the water district views all water supply facilities as contributing to the common benefit of effective water resources management, so that water charges are based on the common benefits of capital and operations outlays, rather than by reference to named facilities. Third, the district manages water supplies through taxing and pricing to utilize water resources to the advantage of the present and future populations of the County, including the effective use of available resources and supplies for potential drought conditions. Finally, the water district collects revenues in a common fund, rather than designating them for a specific cost, so that revenues are available for general capital and operating outlays. As a result, the water district sets water charges to provide the revenues required in the common fund for general capital and operating outlays which are over and above revenues from ad valorem taxes, interest, and other sources.

Each year, the water district estimates future revenues, capital and operations costs, debt proceeds, projected demand, and available supply, to create a rolling 10-year expenditure forecast that provides the basis for developing budget targets and analyzing the long-term financial sustainability of district funds. The amount of projected costs that are not funded by property taxes, interest earnings, debt proceeds, and other income is covered by water charges. A water charge projection is then calculated for each zone to recover the revenue requirements over a 10-year time period. Each year, the water district also prepares an annual report on the Protection and Augmentation of Water Supplies, which is required by the District Act to include "information specifying the benefits that have been received and will be received within the zone or zones where a groundwater charge has been levied and collected." (§ 26.5, subd. (b)(4).)

Since 2010, the water district has employed a six-step process for establishing its groundwater rates. First, the water district identifies pricing objectives and constraints, such as revenue sufficiency and stability, the cost of service-based allocations, legal

8

considerations, environmental stewardship, economic development, demand management, and minimization of customer impacts.

Second, the district identifies revenue requirements, which include all costs incurred to operate its water utility division, such as operations and maintenance costs, funding sources for the capital improvement plan, and debt-service requirements, within the scope of the allowable uses of groundwater revenues set forth in section 26.3.

Third, after the revenue requirements have been identified, costs are allocated to various customer classes. The allocation process consists of three steps: (1) allocation to functions, such as obtaining or transmitting water supply sources, water treatment, and management and administration costs; (2) allocation to zones; and (3) allocation to customer classes, such as recipients of groundwater, treated, imported or recycled water.

Fourth, the water district allocates offsets to the customer classes, generated from non-user-related revenues, consistent with the revenue pooling concept articulated in the pricing policy through which the water district collects revenues in a common fund, rather than designating them for a specific cost.[3] Once the offsets have been allocated, they are subtracted from the allocated revenues to derive the net revenue requirements to be recovered from rates.

Fifth, the water district develops unit costs of service by customer class. To do this, the net revenue requirements are divided by the projected units of usage of acre-feet of water for each customer class. As the water district explains it, the resulting unit cost represents the unit cost if there were no conjunctive use benefit, and the district did not have policies to achieve specific pricing objectives.

---

[3] Some revenues, such as certain property taxes, are designated for specific costs and therefore are not part of the revenue pooling. The water district uses a portion of the revenue it receives from the County via ad valorem property taxes to fund the discount for agricultural groundwater pumpers, as discussed below.

Sixth, final unit rates are developed for each customer class by making two adjustments to ensure that the rate structure is consistent with the water district's primary pricing objectives. An agricultural adjustment is made to comply with a particular provision in the pricing policy, which mandates that rates for agricultural water not exceed one-tenth the rate for all water other than agricultural water. The District Act mandates that the rate for agricultural water not exceed one-fourth of the rate for all water other than agricultural water, but the water district has elected to impose a steeper discount. (§ 26.7, subd. (a)(3)(D).) The pricing policy states: "In order to encourage the continuance of agricultural use of land in the County, to encourage the preservation of open space, to defer intensification of users and to further support the limitation imposed by the State Legislature, it is the District's policy that rates for agricultural water shall not exceed one-tenth the rate for all water other than agricultural water." This agricultural discount is referred to by the water district as the "Open Space Credit."

Separately, a conjunctive use adjustment, sometimes called a treated water adjustment, is made so that groundwater and treated water customers are "economically indifferent" to which source of water they receive, for example by reallocating some of the costs of treated or recycled water to groundwater users.

Water-year 2011–2012 provides an example of how the water district conducted this six-step pricing methodology for the north zone.[4] First, the water district calculated the total north zone program requirements, consisting of operating outlays plus capital costs and transfers, to be $191,107,000. Next, it applied non-rate revenues such as property taxes, interest earnings, capital contributions, capital cost recovery, and debt proceeds to the program costs, resulting in adjusted revenue requirements after offsets of $122,530,000.

---

[4] The District Act defines a "water year" as July 1 of one calendar year to June 30 of the following calendar year. (§ 26.1.)

The water district then reallocated $21,917,000 of treated water costs to groundwater users based on proportional usage, to meet the pricing policy objectives and conjunctive use policy. The resulting charge for non-agricultural groundwater was $569 per acre-foot. Based on that rate, non-agricultural groundwater revenue was projected to be $52,329,000. Total aggregate water rate revenue including groundwater, treated water, and surface water was projected to be $122,311,000.

Finally, agricultural groundwater was subsidized with $194,000 in ad valorem property tax revenues—the open space credit—bringing the agricultural groundwater rate down to $17.10 per acre foot.

### F. Initial lawsuit and court of appeal opinions

Great Oaks filed the initial lawsuit in this case in November 2005—case No. H035260—in which it alleged that the groundwater charges levied against it in water year 2005–2006 were property-related taxes in violation of the District Act and the constitutional provisions enacted by Proposition 218, which provisions impose procedural and substantive constraints on fees and charges levied by local public entities. The trial court agreed and awarded a complete refund of the charges paid by Great Oaks.

This court ultimately held that the groundwater charges were property-related charges, but that they were exempt from Proposition 218's voter approval requirement because they were also a charge for water service. However, the California Supreme Court then granted Great Oaks's petition for review.[5]

At roughly the same time, the California Supreme Court also granted review in a case from the Second District with similar facts and issues. That resulted in the Supreme Court's 2017 decision in *City of San Buenaventura v. United Water Conservation District*

---

[5] This court's opinion was initially published—*Great Oaks Water Company v. Santa Clara Valley Water District* (2015) 242 Cal.App.4th 1187—but was later depublished following Supreme Court review.

(2017) 3 Cal.5th 1191 (*San Buenaventura I*), in which it held that groundwater charges levied by that water district were not property-related fees subject to the requirements of Proposition 218. However, the Court also held that the charges were subject to evaluation as taxes under Proposition 26, which had been enacted in 2010. (*Id.* at pp. 1198, 1214–1215.) Because the Second District Court of Appeal had not sufficiently conducted that evaluation, the California Supreme Court remanded the matter for it to do so.[6] (*Id.* at p. 1215.)

As a result, the California Supreme Court also directed this court to vacate its decision and reconsider the cause in light of *San Buenaventura I*. (*Great Oaks Water Company v. Santa Clara Valley Water District* (2018) 419 P.3d 923.) That resulted in this court's subsequent unpublished decision in 2018, in which we reversed the trial court and held that the groundwater charges levied against Great Oaks for water year 2005–2006 were not property-related charges under article XIII D of the California Constitution (*Great Oaks I*).

We did not address the application of Proposition 26, however, because Great Oaks had not yet brought such a challenge, as the initial lawsuit had been filed before Proposition 26 was enacted.

### G. Amended master complaint and hearing

In the meantime, because *Great Oaks I* had only adjudicated the water district's charges levied in fiscal year 2005–2006, Great Oaks had continued to file additional lawsuits challenging every subsequent water year's charges. Following remand after *Great Oaks I*, the trial court ordered Great Oaks to file an amended master complaint

---

[6] That later resulted in another published opinion from the Second District Court of Appeal, in which it conducted the analysis pursuant to Proposition 26. (*City of San Buenaventura v. United Water Conservation District* (2022) 79 Cal.App.5th 110 (*San Buenaventura II*).)

challenging all the charges in all water years, which resulted in the instant lawsuit, Case No. H050939.

Great Oaks filed the operative first amended master complaint on February 22, 2021 (complaint).[7] It alleged that the water district's groundwater charges levied against it in both zones, from 2010 to the date of the complaint, violated the provisions of the California Constitution enacted by Proposition 26. Specifically, it alleged that the charges violated Proposition 26 because they were more than necessary to cover the reasonable costs of the governmental activity, and the manner in which those costs were allocated to Great Oaks did not bear a fair or reasonable relationship to Great Oaks's burdens on, or benefits received from, the governmental activities. According to Great Oaks, the groundwater charges therefore constituted taxes that required, but had not obtained, voter approval.[8]

Great Oaks also alleged that the Open Space Credit—the method by which the water district has discounted its agricultural groundwater charges and has funded those discounts—violates the California Constitution and the District Act.

The complaint sought declaratory and injunctive relief, a writ of mandate, and a refund of groundwater charges for the challenged years.

The water district certified and lodged the administrative record in January 2021.[9] The parties then submitted briefing both before and after a four-day hearing held in June 2022.

---

[7] The complaint included two additional named plaintiffs—Mike Rawitser Golf Shop and Santa Teresa Golf Club—which are no longer parties to the action.

[8] The parties stipulated that Proposition 26 was not retroactive, so the groundwater charges levied between 2005 and November 2010—the effective date of Proposition 26—were not subject to the constitutional provisions implemented by the measure. Nevertheless, Great Oaks alleged that the groundwater charges for those years were unlawful taxes.

[9] Great Oaks initially objected to the administrative record, but the trial court overruled those objections. Great Oaks does not challenge the validity of the administrative record on appeal.

13

### H. Trial court statement of decision

The trial court issued its final statement of decision in February 2023. It began by stating that the first two exceptions to a "tax" under Proposition 26 were "potentially applicable" to the groundwater charges at issue: either a specific benefit conferred, or privilege granted, or a specific government service or product provided, "directly to the payor that is not provided to those not charged, and which does not exceed the reasonable costs to the local government." (Cal. Const., art. XIII C, § 1, subd. (e)(1), (2).)

The court then conducted what the California Supreme Court has labeled the "aggregate cost inquiry"—whether the charges were more than necessary to cover the reasonable costs of the relevant governmental activity—and the separate "allocation inquiry"—whether the manner in which those costs were allocated to Great Oaks bore a fair or reasonable relationship to the benefits it receives from, or the burdens it imposes on, that governmental activity, as required by Proposition 26. (*San Buenaventura I, supra*, 3 Cal.5th at p. 1212; Cal. Const., art. XIII C, § 1, subd. (e).)

With respect to the aggregate cost inquiry, the trial court began by resolving definitional disputes regarding what constitutes the relevant "charge" and "governmental activity." It first held that the relevant charges are the non-agricultural groundwater pumping charges—in other words, the charges that Great Oaks is challenging—while the governmental activity is, as the water district had contended, the entire water utility program, "because all the Water Utility's work is aimed, in some fashion, toward its mission of preserving and distributing groundwater," including, for instance, the water district's in-lieu recharge and conjunctive use program, as well as capital projects relating to water supply.

The court then compared, on a zone-by-zone and year-by-year basis, the non-agricultural groundwater charge revenues with the program costs of the entire water utility program and determined—based on the financial numbers from the water district's reports—that they satisfied the aggregate cost inquiry.

With respect to the allocation inquiry, the trial court began by making certain threshold legal determinations. First, it held that the allocation determination may be done on a group basis, as opposed to a payor-by-payor basis, because the question of proportionality—that is, the fairness or reasonableness of a proposed allocation—is not measured on an individual basis, but rather by collectively considering all ratepayers. Second, the court held that volumetric charges are a fair way of allocating costs, as long as they are imposed on similarly situated users, because the more water pumped, the more benefit a payor would receive from a local government agency designed to preserve, obtain and deliver that water.

The trial court then held there was substantial evidence in the record showing that providing alternative sources of water to some, but not all, groundwater pumpers reduces over-drafting and maintains the supply for other pumpers in the area. In other words, "water is fungible." In addition, the court held that the record supported the propriety of allocating some costs of treated and recycled groundwater to groundwater pumpers, even those that do not use such treated or recycled water, as part of the conjunctive use policy. Further, it held, the water district has the statutory authority under the enabling statutes to regulate groundwater in a comprehensive way, and has set its groundwater charges based on various factors such as each zone's operational costs, the availability of non-charge revenues, and the anticipated water usage in each zone. Based on that evidence, the court concluded, the record demonstrated that the group of non-agricultural water users, which includes Great Oaks, received substantial benefits from alternative sources of water for the fiscal years at issue and in each zone, so it was reasonable to impose some of the costs of those alternative sources on payors in that group via volumetric charges.

Lastly, the trial court held that the Open Space Credit imposed pursuant to the District Act and water district policy does not violate the California Constitution because the discount is not being paid for with the revenue from the charges levied on the non-

15

agricultural pumpers. Instead, the discount is paid for completely by "other revenues" from ad valorem property taxes and interest income.

The trial court entered judgment on March 1, 2023. Great Oaks timely appealed.

## II. DISCUSSION

Great Oaks argues on appeal that (1) the trial court erred by failing to make a finding as to whether any exception to taxes under Proposition 26 applies to the groundwater charges and, in fact, no exception applies; (2) the trial court failed to perform a proper aggregate cost inquiry, instead improperly measuring the groundwater charges for each year against the total costs of all water district activities for all water programs, meaning groundwater charges could *never* be more than necessary to cover the reasonable costs of the governmental activity; (3) the trial court failed to conduct a proper allocation inquiry for numerous reasons; and (4) the Open Space Credit—the use of ad valorem property taxes for the payment of agricultural groundwater charges—violates the District Act and the California Constitution.

The water district argues that (1) Great Oaks "waived"[10] any argument that the evidence is insufficient because it did not discuss the evidence supporting the trial court's factual determinations; (2) the trial court correctly found that groundwater charges are not taxes under article XIII C of the California Constitution and thus do not require voter approval; (3) substantial evidence supports the trial court's finding that the water district's conjunctive use policy supports the reasonableness of charging groundwater pumpers for some of the cost to provide alternative water supplies; (4) substantial evidence supports the trial court's finding that the aggregate revenue from groundwater charges is less than the aggregate costs to provide service; (5) substantial evidence

---

[10] Although the water district contends Great Oaks "waived" this argument, the more accurate term is "forfeited." (*North American Title Company v. Superior Court of Fresno County* (2024) 17 Cal.5th 155, 177–178.)

16

supports the trial court's finding that the cost of the water program is fairly allocated between rate payers; and (6) the Open Space Credit is legal.

### A. Applicable law

Because Great Oaks's arguments are primarily based on alleged violations of Proposition 26, we begin with an overview of that proposition and the predecessor propositions that gave rise to it. (See, e.g., *Zolly v. City of Oakland* (2022) 13 Cal.5th 780, 785 (*Zolly*) [to understand Proposition 26, "it is helpful to place it in the context of other voter initiatives that have limited the ability of local governments to tax, beginning in 1978 with the passage of Proposition 13"].)

### 1. Proposition 13

Passed in 1978, Proposition 13 added article XIII A to the California Constitution. (*San Buenaventura I, supra*, 3 Cal.5th at p. 1199.) Its purpose was to provide effective real property tax relief through an " 'interlocking package' " of " 'a real property tax rate limitation (art. XIII A, § 1), a real property assessment limitation (art. XIII A, § 2), a restriction on state taxes (art. XIII A, § 3), and a restriction on local taxes (art. XIII A, § 4).' " (*Id.* at p. 1199, quoting *Sinclair Paint Co. v. State Bd. of Equalization* (1997) 15 Cal.4th 866, 872 (*Sinclair Paint*).)

The main provisions of Proposition 13 capped ad valorem property taxes at one percent of a property's assessed value, and limited increases in assessed valuation to two percent per year, unless and until the property changed hands. (*San Buenaventura I, supra*, 3 Cal.5th at p. 1199, citing Cal. Const., art. XIII A, §§ 1, 2; *Apartment Association of Los Angeles County, Inc. v. City of Los Angeles* (2001) 24 Cal.4th 830, 836 (*Apartment Association*).) The initiative also prohibited counties, cities, and special districts from enacting any "special tax" without a two-thirds votes of the electorate, " 'to prevent local governments from subverting its limitations.' " (*San Buenaventura I, supra,* at p. 1199, quoting *Apartment Association, supra*, at p. 836; Cal. Const., art. XIII A, § 4.)

### 2. *Proposition 218*

However, courts soon uniformly held that Proposition 13 did not prevent local governments from imposing special assessments, or " 'charges levied on owners of real property directly benefited by a local improvement to defray its costs.' " (*San Buenaventura I, supra,* 3 Cal.5th at pp. 1199–1200, quoting *Knox v. City of Orland* (1992) 4 Cal.4th 132, 141.)

Largely as a result of that "perceived loophole," voters passed Proposition 218 in 1996 to place analogous restrictions on assessments, fees, and charges. (*San Buenaventura I, supra,* 3 Cal.5th at p. 1200.) Proposition 218 added article XIII D to the California Constitution, which " 'imposes certain substantive and procedural restrictions on taxes, assessments, fees, and charges 'assessed by any agency upon any parcel of property or upon any person as an incident of property ownership.' " (*Id.*, quoting Cal. Const., art. XIII D, § 3, subd. (a).) Article XIII D provides that the amount of a " 'fee or charge imposed upon any parcel or person as an incident of property ownership shall not exceed the proportional cost of the service attributable to the parcel.' " (Cal. Const., art. XIII D, § 6, subd. (b)(3).)

"Proposition 218 also added article XIII C, which restricts the authority of local governments to impose taxes by, among other things, requiring voter approval of all taxes imposed by local governments." (*San Buenaventura I, supra,* 3 Cal.5th at p. 1200.) "Article XIII C provides that all taxes imposed by local governments are either general taxes or special taxes (art. XIII C, § 2, subd. (a)), and requires all general taxes to be approved by a majority vote (art. XIII C, § 2, subd. (b)) and all special taxes to be approved by a two-thirds vote (art. XIII C, § 2, subd. (d))." (*Id.* at p. 1200, fn. 3.)

### 3. *Proposition 26*

Finally, in 2010, voters passed Proposition 26, "which further expanded the reach of article XIII C's voter approval requirement by broadening the definition of a tax to include 'any levy, charge, or exaction of any kind imposed by a local government.' "

(*San Buenaventura I, supra,* 3 Cal.5th at p. 1200, quoting Cal. Const., art. XIII C, § 1, subd. (e); see also, *Zolly, supra*, 13 Cal.5th at p. 785 [because Prop. 218 did not define what constitutes a tax, "[t]he electorate addressed that issue in 2010 with the enactment of Proposition 26"].)

Proposition 26's findings declared that " 'California taxes have continued to escalate,' [and] 'Californians are taxed at one of the highest levels of any state in the nation.' " (*City of Gridley v. Superior Court* (2024) 104 Cal.App.5th 1201, 1211 (*Gridley*), citing Voter Information Guide, Gen. Elec. (Nov. 2, 2010) text of Prop. 26, § 1, subds. (c), (e), & (f), p. 114.)  The measure was therefore intended to restrict local governments' ability to increase taxes without voter approval, and "evinced a clear concern about high tax burdens." (*Gridley, supra,* at p. 1211, citing *Humphreville v. City of Los Angeles* (2020) 58 Cal.App.5th 115, 124.)

However, Proposition 26 also included seven enumerated exceptions to the definition of "tax" for certain types of exactions.  (Cal. Const., art. XIII C, § 1, subd. (e).) The first two exceptions, relevant to this appeal, are for (1) a "charge imposed for a specific benefit conferred or privilege granted directly to the payor that is not provided to those not charged, and which does not exceed the reasonable costs to the local government of conferring the benefit or granting the privilege," and (2) a "charge imposed for a specific government service or product provided directly to the payor that is not provided to those not charged, and which does not exceed the reasonable costs to the local government of providing the service or product." (Cal. Const., art. XIII C, § 1, subd. (e)(1), (2).)

In addition, after the seven enumerated exceptions, the final paragraph of subdivision (e) states:  "The local government bears the burden of proving by a preponderance of the evidence that a levy, charge, or other exaction is not a tax, that the amount is no more than necessary to cover the reasonable costs of the governmental activity, and that the manner in which those costs are allocated to a payor bear a fair or

19

reasonable relationship to the payor's burdens on, or benefits received from, the governmental activity." (Cal. Const., art. XIII C, § 1, subd. (e).)[11]

### B. *Standard of review*

We independently review whether the groundwater charges fall within an article XIII C, subdivision (e) exception. (*Sutter's Place, Inc. v. City of San Jose* (2024) 104 Cal.App.5th 855, 863 (*Sutter's Place*), citing *San Buenaventura II, supra,* 79 Cal.App.5th at p. 119; see also, *Griffith v. City of Santa Cruz* (2012) 207 Cal.App.4th 982 (*Griffith*); *San Diego County Water Authority v. Metropolitan Water District of Southern California* (2017) 12 Cal.App.5th 1124; *Newhall County Water District v. Castaic Lake Water Agency* (2016) 243 Cal.App.4th 1430 (*Newhall County*).) When a trial court's order involves the interpretation and application of a constitutional provision, it raises questions of law subject to independent review. (*Prigmore v. City of Redding* (2012) 211 Cal.App.4th 1322, 1333.)

"When construing constitutional provisions and statutes, including those enacted through voter initiative, we apply the same principles of interpretation." (*Loeber v. Lakeside Joint School District* (2024) 103 Cal.App.5th 552, 580 (*Loeber*), citing *California Cannabis Coalition v. City of Upland* (2017) 3 Cal.5th 924 (*California Cannabis*).) " 'Our primary concern is giving effect to the intended purpose of the provisions at issue.' [Citation.] 'When, as here, the voters enacted the provision, their intent governs.' " (*Loeber, supra*, at p. 580, quoting *Bighorn-Desert View Water Agency v. Verjil* (2006) 39 Cal.4th 205, 212. "To determine the voters' intent, we analyze the text of the provision in its relevant context, 'ascribing to words their ordinary meaning' and 'taking account of related provisions and the structure of the relevant statutory and

---

[11] "Proposition 26 also amended article XIII A to include a similar, though not identical, definition and list of exemptions regarding what constitutes a tax imposed by the state government." (*Zolly, supra,* 13 Cal.5th at p. 786; Cal. Const., art. XIII A, § 3.)

constitutional scheme.' " (*Loeber, supra*, at p. 580, quoting *California Cannabis, supra*, at p. 933.)

Nevertheless, in exercising our independent review, we "presume the appealed judgment is correct and do not decide disputed issues of fact." (*San Buenaventura II, supra*, 104 Cal.App.5th at p. 863, citing *Moore v. City of Lemon Grove* (2015) 237 Cal.App.4th 363, 368–369.)

Nor does the independent review standard "change the substantial evidence standard of review [or] allow us to independently resolve issues of disputed fact already decided by the trial court." (*San Buenaventura II, supra*, 79 Cal.App.5th at p. 119.) " 'If an appellant challenges a finding of fact, we must employ the substantial evidence standard of review. As such, we are not concerned about a conflict in the evidence. … "Rather, it is simply whether there is substantial evidence in favor of the respondent. If this 'substantial' evidence is present, no matter how slight it may appear in comparison with the contradictory evidence, the judgment must be upheld. As a general rule, therefore, we will look only at the evidence and reasonable inferences supporting the successful party, and disregard the contrary showing." [Citation.]' " (*Id*. at pp. 119–120, quoting *Morgan v. Imperial Irrigation Dist.* (2014) 223 Cal.App.4th 892, 917; *Newhall County, supra*, 243 Cal.App.4th at p. 1440.)

### C. *Analysis*

#### 1. *Subdivision (e) exceptions to "tax"*

The first exception listed in article XIII C, section 1, subdivision (e), is for charges "imposed for a specific benefit conferred or privilege granted directly to the payor that is not provided to those not charged, and which does not exceed the reasonable costs to the local government of conferring the benefit or granting the privilege." (Cal. Const., art.

XIII C, § 1, subd. (e)(1).)[12]  The second exception is for charges "imposed for a specific government service or product provided directly to the payor that is not provided to those not charged, and which does not exceed the reasonable costs to the local government of providing the service or product."  (Cal. Const., art. XIII C, § 1, subd. (e)(2).)

As we construe these provisions pursuant to our independent review, there are multiple distinct requirements for a tax to qualify for one of the first two exceptions.  First, the charge must be a "specific benefit conferred," a "privilege granted," or a "specific government service or product."[13]  (Cal. Const., art. XIII C, § 1, subd. (e)(1), (2).)

Second, the charge must have been "imposed."  (See, e.g., *Zolly, supra*, 13 Cal.5th at p. 791 [in context of Constitution's tax provisions, ordinary meaning of "impose" is "to establish"]; *Gridley, supra,* 104 Cal.App.5th at p. 1210 [City did not "impose" its electric rates at the relevant time because it had enacted them earlier].)

Third, the benefit, privilege, or service must have been granted directly to the payor and not provided to those not charged.  (Cal. Const., art. XIII C, § 1, subd. (e)(1), (2).)

Fourth, the charge must not exceed the reasonable costs to the local government of conferring or providing the benefit, privilege, or service, which the government bears the burden of proving by a preponderance of the evidence.  (Cal. Const., art. XIII C, § 1, subd. (e)(1), (2).)

And fifth, the government must prove by a preponderance of the evidence that the manner in which those costs are allocated to a payor bears a fair or reasonable

---

[12] The water district did not contend that the groundwater charges is not a "levy, charge, or exaction of any kind imposed by a local government."  (See, e.g., *Zolly, supra,* 13 Cal.5th at p. 792 ["[h]aving determined that the challenged fees fall within Proposition 26's general definition of a tax," court then considered applicability of exceptions].)

[13] For ease of reference, we refer to these hereafter as a "benefit," "privilege," or "service."

22

relationship to the payor's burdens on, or benefits received from, the governmental activity. (Cal. Const., art. XIII C, § 1, subd. (e).)

We address these in turn below.

### (a) Benefit, privilege, or service

Here, the water district grants Great Oaks the right to extract groundwater, pursuant to its authority under the District Act. (§ 26.) Exercising our independent review, we conclude that right constitutes a benefit, privilege, or a service. (See, e.g., *San Buenaventura I, supra,* 3 Cal.5th at pp. 1210–1211 [charge imposed on well operators was for privilege of extracting water from underground reserves]; Gov. Code, § 53758, subd. (a) [defining "specific benefit"], subd. (b) [defining "specific government service"].)

We need not decide here which of those labels fits best, because the remaining requirements are the same. Whether it is a benefit, privilege, or service, it must be provided directly to the payor and not to others not charged; it must not exceed the reasonable costs to the local government of providing the benefit, privilege or service; and the manner in which those costs are allocated to a payor must bear a fair or reasonable relationship to the payor's burdens on, or benefits received from, the governmental activity. (Cal. Const., art. XIII C, § 1, subd. (e); *San Buenaventura I, supra*, 3 Cal.5th at p. 1211 ["privilege," "benefit" and "government service or product" all subject to same set of requirements].)

Significantly, Great Oaks does not argue that the right to extract groundwater is not a specific benefit, privilege, or service. Instead, it argues only that the *other* requirements of subdivision (e) are lacking. Accordingly, they have forfeited any such argument. (See, e.g., *Claudio v. Regents of the University of California* (2005) 134 Cal.App.4th 224, 230 [review limited to issues adequately raised and briefed] (*Claudio*).)

Great Oaks does argue that the trial court failed to make any finding altogether as to which exception applies, which it claims constitutes error. However, we exercise de

23

novo review here and reach our conclusion independent of what the trial court determined.

### *(b) Provided directly to the payor and not to others not charged*

Great Oaks claims that the groundwater charges are levied to pay for the water district's groundwater program activities and a portion of its treated water, recycled water and surface water program activities.[14] According to Great Oaks, that constitutes a "mixture of *specific* benefits to the payor and *common* benefits to both the payor and to those not paying the Groundwater charge (i.e., all water users in general)," and therefore does not qualify for an exception because it was imposed for something other than a specific benefit conferred directly to the payor that is not provided to those not charged. In Great Oaks's view, the purpose of the water district's reallocation of program costs to groundwater pumpers is not to provide a specific benefit to payors of the groundwater charge that are not provided to those not charged, but instead is to provide common benefits through an overall water management strategy, thereby disqualifying it from falling under one of the first two exceptions.

To the extent Great Oaks means to argue that the use of groundwater charge revenues to fund non-groundwater program activities violates the "directly to the payor that is not provided to those not charged" requirement, it is mistaken. (Cal. Const., art. XIII C, § 1, subd. (e) (1), (2).) The plain language of this provision states that the test is whether the benefit, privilege, or service itself is granted directly to the payor, or whether it is also granted to others that are not charged. Here, the benefit, privilege, or service is the right to extract groundwater, which is granted only to those who pay for that right, such as Great Oaks. There is no evidence that the right to extract groundwater is granted to any entity that is not charged for that right.

---

[14] Because neither party has argued that the charge was not "imposed" on Great Oaks by the water district, we do not address that requirement of article XIII C, section 1, subdivision (e)(1) and (2).

24

The fact that the revenue derived from the groundwater charges may benefit others does not alter this conclusion. In defining "specific benefit," for instance, the Government Code provides that "[a] specific benefit is not excluded from classification as a 'specific benefit' merely because an indirect benefit to a nonpayor occurs incidentally and without cost to the payor as a consequence of providing the specific benefit to the payor." (Gov. Code, § 53758, subd. (a).)

Lastly, to the extent Great Oaks means to argue that the use of groundwater charge revenues to fund non-groundwater program activities violates the requirement that the charge not exceed the reasonable costs to the government of providing the benefit, product, or service, we address that contention in the following section.

### (c) Aggregate cost inquiry

Great Oaks next challenges the aggregate cost inquiry, or the requirement that the water district prove by a preponderance of the evidence that the amount charged is no more than necessary to cover the reasonable costs of the governmental activity.

As a preliminary matter, we note that subdivision (e) includes similar language regarding "reasonable costs" in two different locations. First, exceptions (1) and (2) include the requirement that the charge "not exceed the reasonable costs to the local government" of providing the benefit, privilege, or service. (Cal. Const., art. XIII C, § 1, subd. (e)(1), (2).) Second, the final, unnumbered, paragraph of subdivision (e) provides that the government bears the burden of proving by a preponderance of the evidence that "the amount is no more than necessary to cover the reasonable costs of the governmental activity." (Cal. Const., art. XIII C, § 1, subd. (e).)

We need not address the interplay between those two provisions here, however, because the California Supreme Court has held that the second of those provisions establishes the aggregate cost inquiry, and Great Oaks does not argue that the language

within exceptions (1) and (2) imposes a separate or different requirement that was unsatisfied here. (*San Buenaventura I, supra*, 3 Cal.5th at p. 1212.)

Beginning with the plain language of the final paragraph of article XIII C, section 1, subdivision (e), we recognize, as the trial court did, that it contains two undefined terms about which the parties disagreed. The first term, which is not at issue in this appeal is the relevant "charge" levied by the government. In the trial court, Great Oaks argued that the relevant charge was limited to what it challenges in this lawsuit—the non-agricultural groundwater charges in each particular zone. The water district argued that the relevant charge was *all* water charges—including but not limited to groundwater charges—across both zones. The trial court agreed with Great Oaks on this point and held that the relevant charges are the non-agricultural groundwater charges only, separately evaluated for each zone.

The second term, which is at issue in this appeal, is the "reasonable costs of the governmental activity." Great Oaks argued in the trial court that the governmental activity should be limited to non-agricultural groundwater program activities, and not include any other aspects of the water utility's overall water management program, such as activities related to imported, treated, or recycled water. The water district argued that the governmental activity should include *all* actions it takes to protect, augment, and maintain the groundwater supply, which includes the entirety of the water utility's program activities.

The trial court agreed with the water district and held that the entire water utility program counts as the relevant governmental activity because the whole program "is aimed, in some fashion, toward its mission of preserving and distributing groundwater," and is necessary to provide Great Oaks and other pumpers access to groundwater. The court noted that the water district's conjunctive use management policy as a whole helps preserve groundwater and maintain the health of the basin, and that capital projects relating to water supply also benefit groundwater production and preservation. The trial

26

court relied on case law under both Proposition 218 and Proposition 26, which it found has taken "a broad view of the costs needed to provide the 'government activity' at issue."

As the trial court explained its holding, it broadly characterized water district actions which were not themselves groundwater pumping—such as importing and treating water—as actions that "materially enhance the District's groundwater preservation and distribution program." The court deemed the water district's conjunctive use approach to groundwater management to be reasonable because "overall supply reliability is increased by managing [the] groundwater subbasins and maximizing the District's influence over other components of water supply." In addition, "managing surface water, imported water, treated water, water conservation, groundwater recharge, recycling, local surface storage, and water banking in a collective fashion decreases overall vulnerability to the risk of groundwater overdraft and depletion."

Great Oaks argues that the trial court's ruling "defies… the applicable law." First, Great Oaks contends that, pursuant to the plain language of article XIII C, section 1, subdivision (e), "if a charge is imposed for non-specific or common benefits that are provided to a payor of the charge that is also provided to those not charged, the charge cannot qualify as an exception to taxes under subd. (e)(1)." It cites the trial court's finding that the groundwater charge pays for activities of "common benefit to all waters users," and argues it shows that the groundwater "charge does not provide a specific benefit to Great Oaks that is not provided to those not charged."

Great Oaks misconstrues article XIII C, section 1, subdivision (e). As explained above, the benefit, privilege, or service provided directly *to* Great Oaks here is the right to extract groundwater, which is not provided to anyone not paying the groundwater charges. By contrast, the benefits that result *from* imposition of the groundwater charges—here, the overall water management program and enhancement of the groundwater basins—need not be limited to the payors of the charge. Instead, the

27

aggregate cost inquiry mandates only that the charge not exceed the reasonable costs of the governmental activity. That test is satisfied here.

Great Oaks argues that the "broad view" the trial court took of the costs needed to provide the governmental activity at issue is not supported by the case law. It cites *San Buenaventura I*, arguing that, although the water agency in that case both managed groundwater and reduced demand for groundwater by delivering water from other sources, "the charges for those pipeline deliveries of alternative water supplies were not considered or even discussed, and certainly were not part of the costs" of the relevant governmental activity included in the aggregate cost inquiry.

Great Oaks misreads *San Buenaventura I*. The California Supreme Court did not conduct an aggregate cost inquiry at all in that case—instead, it merely held that the aggregate cost inquiry and the allocation inquiry were distinct steps in the analysis, and that the court of appeal had failed to conduct the latter. (*San Buenaventura I, supra*, 3 Cal.5th at p. 1212.) Nothing in *San Buenaventura I* stands for the proposition that the relevant "governmental activity" must be circumscribed and may not include broader program management activities.

Great Oaks also objects to the trial court's reliance on *Citizens for Fair REU Rates v. City of Redding* (2018) 6 Cal.5th 1, which it cited as an example of a case that took a broad view of the costs needed to provide the governmental activity at issue, and which held that "the reasonable costs include expenditures to generate and acquire electricity and other costs typical of utility operations." (*Id*. at pp. 15–16.) Great Oaks argues the case is inapposite because the " 'other costs of utility operations'[ ] only involved costs of general government administrative services provided by the [city] to its own electric utility, and those 'other costs' did not increase electric rates." We need not address the extent to which the facts of that case are analogous, though, as the trial court cited it only for the general proposition that courts may take a "broad view" of the costs of the governmental activity.

28

We have read and considered the other cases cited by Great Oaks, and we are not persuaded that the trial court applied an incorrect legal standard by taking a "broad view" of the costs needed to provide the relevant governmental activity.

Having concluded that the trial court applied a correct legal standard, we similarly conclude that substantial evidence supports the trial court's finding that the relevant governmental activity in this case is the entirety of the water utility's program activities in each zone. For example, the record shows that the water district treats water as a fungible commodity via its conjunctive use policy, which it has maintained since the 1930s. This coordinated use of groundwater and surface water resources maximizes water supply reliability, allowing the water district "to store surface water in local groundwater basins to help balance pumping and provide reserves for use during dry years when surface water availability is limited." It helps protect against groundwater overdraft and land subsidence, prevent saltwater intrusion, and enhance natural recharge. As a result, "the overall reliability of the water supply system is greatly enhanced when all of the components are combined to complete the water supply picture." Without the in-lieu recharge activities, the users of treated water and recycled water might otherwise use groundwater.

A 1975 study performed by the water district found that importing water substantially benefits groundwater pumpers by reducing demands on the groundwater subbasins. In addition, in 2011 the water district commissioned a study by a consultant, which concluded that groundwater pumpers in both zones benefit more from the conjunctive use policy than they pay out in allocated costs of treated or recycled water. The study confirmed that by recharging groundwater basins with other types of water and providing alternative, non-groundwater sources of water to customers, the groundwater basins will be preserved, thereby helping groundwater pumpers as a group.

In sum, substantial evidence supports the trial court's conclusion that "it makes sense to count the entirety of the Water Utility's work as a 'relevant governmental activity.' "

Great Oaks argues that the trial court's "expansive interpretation" of the relevant governmental activity subverts the intended taxpayer protections of Proposition 26 because, under this standard, the total revenues from the groundwater charge will *never* exceed the total costs of all governmental activities. However, that is not necessarily true and, even if it were, it would not establish a violation of article XIII C, section 1, subdivision (e). First, if the water district were to increase the groundwater charge, but without any corresponding increase in the total costs of all relevant governmental activities, the revenues theoretically could exceed the costs, in which case the charge would constitute a tax pursuant to subdivision (e). Second, the costs component remains subject to a reasonableness standard under the final paragraph of subdivision (e). And third, in scenarios such as this where the relevant governmental activities are so interconnected with one another that they may all be essential to providing the benefit, privilege, or service to the payor, and cannot be fairly segregated, it is likely the reasonable costs will exceed the revenues from the groundwater charges. (See, e.g., *California Association of Professional Scientists v. Department of Fish & Game* (2000) 79 Cal.App.4th 935, 950 (*Professional Scientists*) [regulatory fees are often not easily correlated to a specific ascertainable cost].) Great Oaks has not cited any authority suggesting that Proposition 26 precludes such scenarios.

Having concluded that substantial evidence supports the trial court's determination of the "relevant governmental activity," we similarly review the trial court's subsequent finding that the water district proved by a preponderance of the evidence that the non-agricultural groundwater charges do not exceed the reasonable costs of that activity. As explained above, the trial court compared, on a zone-by-zone and year-by-year basis, the non-agricultural groundwater charge revenues with the program costs of the entire water

utility program, and determined—based on the financial numbers from the water district's reports—that they satisfied the aggregate cost inquiry.

Great Oaks does not challenge that substantial evidence. Indeed, given Great Oaks's position that the trial court's expansive definition of "relevant governmental activity" means the groundwater charges will *never* exceed the total costs, it would be difficult for Great Oaks to mount a substantial evidence challenge to this step of the aggregate cost inquiry, which is essentially a balance sheet comparing groundwater charges to total costs of the entire water utility program.

Great Oaks instead points to evidence in the record it submitted at trial showing what that balance sheet would look like if groundwater charges were compared only to "project costs allocated to Groundwater." The argument fails, though, because the relevant governmental activities are not limited here to project costs allocated only to groundwater. In addition, we are not concerned here about a conflict in the evidence, but rather only about whether there is substantial evidence in favor of the respondent. (*San Buenaventura II, supra*, 79 Cal.App.5th at p. 119 [if substantial evidence is present, no matter how slight in comparison with contradictory evidence, the judgment must be upheld].) "As a general rule, therefore, we will look only at the evidence and reasonable inferences supporting the successful party, and disregard the contrary showing." [Citation.]' " (*Id.* at pp. 119–120.)

### (d) Allocation inquiry – legal determinations

Subdivision (e) of article XIII C, section 1, imposes a separate requirement that the local government prove by a preponderance of the evidence that the manner in which the costs of the governmental activity are allocated to a payor bears a fair or reasonable relationship to the payor's burdens on, or benefits received from, the governmental activity. (Cal. Const., art. XIII C, § 1, subd. (e).) In other words, the amount charged to a payor like Great Oaks generally must be proportional to the benefits the payor receives

31

from, or the burden it imposes on, the governmental activity. As the California Supreme Court explained in *San Buenaventura I*, this language in Proposition 26 was "drawn in large part from pre-Proposition 26 case law distinguishing between taxes subject to the requirements of article XIII A[,] … on the one hand, and regulatory and other fees, on the other." (*San Buenaventura I, supra,* 3 Cal.5th at p. 1210, citing *Jacks v. City of Santa Barbara* (2017) 3 Cal.5th 248, 262.)

The Supreme Court had described that distinction in *Sinclair Paint*, "which concerned the proper categorization of fees imposed on manufacturers of lead-containing products (and others) to raise revenue for a statewide lead poisoning evaluation, screening, and follow[-]up program." (*San Buenaventura I, supra*, 3 Cal.5th at p. 1210, citing *Sinclair Paint, supra,* 15 Cal.4th 866.) As the Court explained, " '[i]n general, taxes are imposed for revenue purposes, rather than in return for a specific benefit conferred or privilege granted,' " and "a fee does not become a tax unless it ' " 'exceed[s] the reasonable cost of providing services … for which the fee is charged.' " ' " (*San Buenaventura, supra*, at p. 1201, quoting *Sinclair Paint, supra*, 15 Cal.4th at pp. 874–876.) In addition, the government must prove " 'the basis for determining the manner in which the costs are apportioned, so that charges allocated to a payor bear a fair or reasonable relationship to the payor's burdens on or benefits from the regulatory activity.' " (*Sinclair Paint, supra,* at p. 878, quoting *San Diego Gas & Electric Company v. San Diego County Air Pollution Control District* (1988) 203 Cal.App.3d 1132, 1146.) "Proposition 26 codified both requirements." (*San Buenaventura I, supra*, 3 Cal.5th at p. 1210.)[15]

---

[15] Identical language also appears in another provision of the California Constitution regarding fees imposed by the state. (Cal. Const., art. XIII A, § 3, subd. (d); see, e.g., *California Building Industry Association v. State Water Resources Control Board* (2018) 4 Cal.5th 1032, 1052 ["[s]o long as 'there is a reasonable basis in the record for the manner in which the fee is allocated among those responsible for paying it,' a regulatory fee will not be deemed an unconstitutional tax under article XIII A"].)

This "pre-Proposition 26 case law made clear that, '[i]n pursuing a constitutionally and statutorily mandated conservation program, cost allocations for services provided are to be judged by a standard of reasonableness with some flexibility permitted to account for system-wide complexity.' " (*San Buenaventura I, supra*, 3 Cal.5th at p. 1210, quoting *Brydon v. East Bay Mun. Utility Dist.* (1994) 24 Cal.App.4th 178, 193 (*Brydon*).)

As summarized above, the trial court found that the water district's non-agricultural groundwater charges had been reasonably allocated on a volumetric basis across the thousands of non-agricultural groundwater pumpers who are water district customers, and that Great Oaks is within the group of payers that receive a significant benefit from the conjunctive use policy and overall water management program.

That ultimate factual finding was predicated on three preliminary legal determinations the trial court made regarding issues the parties disputed. First, the trial court held that the allocation analysis does not need to be made on an individualized payor-by-payor basis, but instead may be measured collectively, considering all rate payors. Second, the trial court held that a government agency may allocate the costs of alternative water supplies to the group of groundwater extractors, in a fair and reasonable manner, if those alternative water supplies provide significant benefits to the group. Third, the trial court held that volumetric charges are a permissible method of allocating costs if they are being imposed on reasonably similar payors.

Great Oaks first challenges these legal determinations, which we review de novo. (*San Buenaventura II, supra*, 79 Cal.App.5th at p. 118.)

### (i)     *Individual vs. group payor analysis*

The California Supreme Court has held that a "regulatory fee does not become a tax simply because the fee may be disproportionate to the service rendered to individual payors." (*California Farm Bureau Federation v. State Water Resources Control Board* (2011) 51 Cal.4th 421, 428 (*Farm Bureau*), citing *Brydon, supra,* 24 Cal.App.4th p. 194.) "The question of proportionality is not measured on an individual basis. Rather, it is

33

measured collectively, considering all rate payors." (*Farm Bureau, supra,* at p. 428, citing *Professional Scientists, supra,* 79 Cal.App.4th at p. 948.) "A fee is valid if there is a reasonable basis in the record for the allocation. [Citation.] The record need only demonstrate a reasonable relationship, not an exact relationship. Courts employ a ' "flexible assessment of proportionality within a broad range of reasonableness" ' in determining the constitutionality of fees." (*American Coatings Association, Inc. v. State Air Resources Board* (2021) 62 Cal.App.5th 1111, 1128.)

Great Oaks does not address any of this authority. Instead, it argues that the plain language of the allocation inquiry portion of article XIII C, section 1, subdivision (e) requires the examination of each *individual* payor's burdens on, or benefits received from, the governmental activity. Great Oaks notes that the constitutional provision uses the word "payor" in the singular: "The language of the 'allocation analysis' involves an individual '*payor*' of the charge."

We do not read article XIII C, section 1, subdivision (e) in that manner. The relevant language—"the manner in which those costs are allocated to a payor"—does not preclude a collective approach to the analysis. More importantly, though, the wealth of case law summarized above has interpreted the language to the contrary, and Great Oaks has not persuaded us to depart from it.

Great Oaks cites *Newhall County* in support of its position. In that case, the court held that, "in the context of wholesale water rates to four water agencies," the allocation inquiry "necessarily requires evaluation on a 'purveyor by purveyor' basis." (*Newhall County, supra*, 243 Cal.App.4th at p. 1446.) However, the case is inapposite here, where there are thousands of customers, not four. Even the court in *Newhall County* recognized that in cases involving "large numbers of payors, who could rationally be (and were)

34

placed in different usage categories, justifying different fees for different classes of payors," a collective approach would make sense. (*Id*. at pp. 1442, 1446.)[16]

Lastly, Great Oaks claims that the trial court's finding here "would effectively eliminate individual consideration of a taxpayer in a challenge to fees or charges levied by a local government on that taxpayer." We do not agree with that assessment. First, the trial court held, as we do, only that the allocation inquiry does not need to be done on a payor-by-payor basis in every instance—it did not determine that the inquiry must always be done collectively. Second, the case law discussed above demonstrates that the nature of the allocation inquiry will be context specific.

### *(ii)* *Allocation of costs of alternative water supplies*

The trial court held that "the costs of significant benefits of the relevant government activity [may] be allocated to payors … [i]f there is a reasonable basis in the record to find that a local government activity benefits, in some material way, the group of users of which the payor is a member," provided that the allocation is done in a fair and reasonable manner. For that reason, "even if a groundwater extractor doesn't have these alternative supplies of water piped by the local agency to its location for use, that extractor—and the entire class of extractors—still receives a substantial benefit from these activities."

In our view, this step in the analysis is unnecessary because it was already established when defining the scope of the relevant governmental activity. In other words, because the relevant governmental activity here includes the entirety of the water

---

[16] A different panel of this court recently cited *Newhall County* approvingly as support for its determination that the trial court in its case had properly engaged "in an individual evaluation of regulatory benefits and burdens." (*Sutter's Place, supra*, 104 Cal.App.5th at p. 865.) However, *Sutter's Place* dealt with a different exception— subdivision (e)(3)—which "describes activities of an individual rather than programmatic nature." (*Id*. at p. 864.) In addition, the case contained only two payors, a similarly narrow class as in *Newhall County*. (*Id*. at p. 865.)

utility's work, under the plain language of article XIII C, section 1, subdivision (e), it is the manner in which *those costs* are allocated which must bear a fair and reasonable relationship to the payor's burdens or benefits.

Great Oaks argues that "[p]roviding alternative water supplies to other water users does not eliminate the required 'allocation analysis.' " We agree that the allocation inquiry is still required—however, we do not interpret the trial court as having held to the contrary and, in fact, it proceeded to conduct the allocation inquiry, as we discuss below.

Great Oaks similarly argues that "[n]either the law nor substantial evidence supports the trial court's finding that the [consultant] reports supporting the District's 'conjunctive use' policy eliminates the required 'allocation analysis' in these cases," and that "[s]tatutory authority for comprehensive water management does not eliminate the required 'allocation analysis.' " We reject these arguments for the same reason—the trial court did conduct the allocation inquiry.

### (iii) Volumetric charges

The trial court held that volumetric, or volume-based, charges are a permissible method of allocating costs if they are being imposed on reasonably similar payors because the "local governmental agency has some discretion on how it allocates costs if there is 'a reasonable basis in the record for the allocation.' " In the trial court's view, a volumetric charge is a "reasonable, easily-administrable measure for how much benefit a payor receives from the government program," because "the more water pumped, the more benefit a payor would receive from a local government agency designed to preserve, obtain, and deliver that water."

Great Oaks argues that this approach is directly contrary to the holding in *San Buenaventura I*, in which the California Supreme Court remanded for further proceedings "in part because the 'volumetric' analysis by the Court of Appeal did not answer the question presented in the required 'allocation analysis,' namely whether 'the manner in which those costs are allocated to a payor bear a fair or reasonable relationship to the

36

payor's burdens on, or benefits received from, the governmental activity.' " (*San Buenaventura I, supra*, 3 Cal.5th at p. 1212.)

Great Oaks misreads the trial court's ruling. The court did not hold that the use of volumetric charges obviates the need to conduct the allocation inquiry or satisfies the inquiry by itself. Nor did the trial court hold that volumetric charges will necessarily be a satisfactory approach in every case. Instead, the trial court held only that the use of volumetric charges is acceptable *if* they are being imposed on reasonably similar payors and there is a reasonable basis in the record for the allocation. As the court expressly stated, "[t]he Court agrees that volumetric charges may or may not fairly allocate costs, depending on the facts."

*San Buenaventura I* did not hold to the contrary. It simply held that the court of appeal had failed to "consider whether the record sufficiently establishes that the District's rates for the [relevant] water years bore a reasonable relationship to the burdens on or the benefits of its conservation activities." (*San Buenaventura I, supra*, 3 Cal.5th at p. 1214.)

### *(e) Allocation inquiry – factual determinations*

Having properly made those threshold legal determinations, the trial court then applied those principles to conduct the allocation inquiry. Among other things, the trial court found that the water district has thousands of customers in different usage categories, so that it is reasonable not to set payor-by-payor rates for customers. As we have explained above, substantial evidence supports that finding in the form of the water district's own annual reports as well as their consultants' reports.

The trial court also found that there was "substantial, unrebutted evidence in the record that providing alternative sources of water to some (but not all) groundwater pumpers reduces overdrafting and maintains the supply for other pumpers in the [water] district." As evidentiary support, the trial court cited the water district's 1975 study and the 2011 consultant study, "which found that importing water substantially benefits

37

groundwater pumpers by reducing demands on the water district's groundwater subbasins."

Next the trial court found that the record supported "the propriety of allocating some costs of treated and recycled water to groundwater pumpers, even ones who don't use treated or recycled water," based on the 2011 consultant study's conclusion that groundwater pumpers in both zones "benefit more from this policy than they pay out in allocated costs of treated/recycled water."

Finally, the trial court found that the water district had "already grouped similarly-situated groundwater pumpers together—that's how zones were created and defined." The evidence in the record, including the pricing policy and the reports demonstrating how the rates were determined each year, showed that the water district set the groundwater charges based on numerous factors, including "the zone's operational costs, the availability of non-charge revenues (which typically are applied to offset operational costs before any charge setting occurs), the anticipated water usage in that zone, and so on."

We conclude that the evidence cited by the trial court constitutes substantial evidence supporting its findings here.

Great Oaks argues that "[t]he notion that all groundwater pumpers in a zone are 'similarly situated' is … belied by the fact that there are known and obvious differences related to pumpers even within the groundwater subbasin." It cites the water district's 2016 groundwater management plan, which allegedly details "the many differences existing throughout the Santa Clara subbasin," and the various subbasins that exist within the two zones.

However, the evidence does not purport to show that all groundwater pumpers are identically situated—only similarly situated. Moreover, the evidence shows the water district set the groundwater charges based on numerous factors, including the zone's operational costs, the availability of non-charge revenues, and the anticipated water usage

38

in a zone. Great Oaks has not demonstrated that this evidence is not substantial, and "we will look only at the evidence and reasonable inferences supporting the successful party, and disregard the contrary showing." (*San Buenaventura II, supra*, 79 Cal.App.5th at pp. 119–120.)[17]

## 2. *Agricultural discount and Open Space Credit*

As Great Oaks acknowledges, the water district uses ad valorem taxes received from the County to fund the Open Space Credit—that is, the significant discount given to agricultural groundwater pumpers. Great Oaks contends that this practice violates the District Act and the California Constitution.

First, Great Oaks argues that the water district "does not and cannot levy ad valorem taxes on an annual basis or otherwise. Ad valorem taxes can only be levied by the County of Santa Clara." Great Oaks's argument here is difficult to decipher. It correctly states that the water district does not levy ad valorem taxes—instead, the County levies them and gives a portion to the district. Thus, the water district did not violate any prohibition against levying ad valorem taxes itself.

Great Oaks also argues that the water district's use of ad valorem taxes to fund the Open Space Credit violates section 26.7, subdivision (c), of the District Act, which provides that "[a]ny groundwater charge levied pursuant to this section shall be in addition to any general tax or assessment levied within the district or any zone or zones

---

[17] Great Oaks makes a similar argument based on section 26.7 of the District Act which, among other things, provides that a groundwater charge "shall be computed at a fixed and uniform rate or rates per acre-foot for agricultural water, and at a fixed and uniform rate or rates per acre-foot for all water other than agricultural water." (§ 26.7, subd. (a)(3)(A).) According to Great Oaks, "[a]ny charge imposed under a statute or resolution requiring a set pricing formula, such as the uniform rate required by Section 26.7(a)(3)(A), without the allocation analysis, is invalid on its face." Great Oaks therefore argues that "trial court's approval of the District's uniform zone-wide groundwater charge without evidence of the mandatory allocation analysis, is reversible error." Again, though, the trial court did conduct an allocation inquiry, so Great Oaks's argument fails.

thereof." (§ 26.7, subd. (c).) According to Great Oaks, the water district uses ad valorem taxes in lieu of groundwater charges, rather than "in addition to," a term Great Oaks argues means "over and above," based on a dictionary definition.

We are unpersuaded. As we read this section, it appears to mean that the imposition of a groundwater charge does not offset or exempt a payor from ad valorem taxes, to which it is still subject. In any case, Great Oaks has not provided any legal authority in support of its construction.

Finally, Great Oaks argues that the use of ad valorem taxes for the special benefit of agriculture directly violates the California Constitution. For support, Great Oaks cites *Silicon Valley Taxpayers' Association, Inc. v. Santa Clara County* (2008) 44 Cal.4th 431, which stated: " 'The rationale of special assessment[s] is that the assessed property has received a special benefit over and above that received by the general public. The general public should not be required to pay for special benefits for the few, and the few specially benefitted should not be subsidized by the general public. [Citation.]' "

As the trial court correctly explained, though, that case "deal[t] with special assessments, not a decision by a local government agency on how to spend money allocated to it." The case is inapposite and we reject Great Oaks's argument here.

### III.    DISPOSITION

The judgment is affirmed. The water district may recover its costs on appeal.

_____
                              Wilson, J.

WE CONCUR:

_____
            Greenwood, P. J.

_____
            Danner, J.

*Great Oaks Water Company v. Santa Clara Valley Water District*
H050939

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| GREAT OAKS WATER COMPANY,<br><br>  Plaintiff and Appellant,<br><br>  v.<br><br>SANTA CLARA VALLEY WATER DISTRICT,<br><br>  Defendant and Respondent. | H050939<br>(Santa Clara County<br>Super. Ct. No. 2011-1-CV205462)<br><br>ORDER MODIFYING OPINION, DENYING PETITION FOR REHEARING;<br>NO CHANGE IN JUDGMENT |

BY THE COURT:

It is ordered that the opinion filed herein on February 28, 2025, be modified as follows:

On page 2, the first sentence of the final paragraph shall now read:

"We conclude the groundwater charges levied against Great Oaks are not "taxes" because they fall under exceptions set out in Proposition 26 for a specific benefit conferred or privilege granted, or a specific government service or product provided directly to the payor that is not provided to those not charged. (Cal. Const., art. XIII C, § 1, subd. (e)(1), (2).)"

On page 33, the second full paragraph shall now read:

"As summarized above, the trial court found that the water district's non-agricultural groundwater charges had been reasonably allocated on a volumetric basis across the thousands of non-agricultural groundwater pumpers who are water district

1

customers, and that Great Oaks is within the group of payors that receive a significant benefit from the conjunctive use policy and overall water management program."

There is no change in the judgment. The petition for rehearing is denied.

_____
                                       Wilson, J.

WE CONCUR:

_____
                                       Greenwood, P. J.

_____
                                       Danner, J.

*Great Oaks Water Company v. Santa Clara Valley Water District*
H05093

Filed 3/28/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| GREAT OAKS WATER COMPANY,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>SANTA CLARA VALLEY WATER DISTRICT,<br><br>    Defendant and Respondent. | H050939<br>(Santa Clara County<br>Super. Ct. No. 2011-1-CV205462)<br><br>ORDER GRANTING REQUESTS FOR PUBLICATION |

     As the nonpublished opinion filed on February 28, 2025, and the modification filed on March 28, 2025, in the above-entitled matter hereby meets the standards for publication specified in the California Rules of Court, rule 8.1105(c), it is ordered that the opinion be certified for publication in the Official Reports.

1

_____
                                    Wilson, J.


WE CONCUR:




_____
            Greenwood, P. J.




_____
            Danner, J.




*Great Oaks Water Company v. Santa Clara Valley Water District*
H050939

Trial Court:                                Santa Clara County
                                            Superior Court No.:  20111CV205462


Trial Judge:                                The Honorable Sunil R. Kulkarni


Attorneys for Plaintiff and Appellant       Robert K. Johnson
Great Oaks Water Company:

                                            Timothy Staten Guster
                                            Jeffrey S. Lawson
                                            Michael W. Stebbins


Attorneys for Defendant and Respondent      Benjamin Peters Fay
Santa Clara Valley                          Edward Kong Low
Water District:                             Gabriel James McWhirter
                                            Brian Cornelius Hopper
                                            Juan-Carlos Orellana
                                            Anthony Tommy Fulcher
                                            Adam Wolf Hofmann
                                            Andrew Martin Gschwind
                                            Rick W. Jarvis

Publication Requestor:
Colantuono, Highsmith & Whatley, PC         Michael George Colantuono
The Law Offices of Young Wooldridge         Brett Anthony Stroud
California State Association of Counties     Jennifer B. Henning


*Great Oaks Water Company v. Santa Clara Valley Water District*
H050939

3